
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72951-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JASPAL SINGH GILL, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: <u>August 14, 2017</u> |
| | ) | |

Cox, J. — Jaspal Gill appeals his judgment and sentence for first degree murder, with a special firearm enhancement, for shooting Harjit Singh to death. The trial court did not abuse its discretion in admitting evidence from the dissolution attorney for Gill's ex-wife. Gill fails in his burden to show that the interpreter's performance at trial materially affected his rights. There was no prosecutorial misconduct during questioning of a key defense witness. Sufficient evidence of premeditation supports the conviction for first-degree murder. And Gill fails to show, for the first time on appeal, that a jury instruction is a manifest error. We affirm.

In August 2012, Harjinder Grewal drove Gill to the home of Gill's ex-wife and children. Harjit Singh[1] was outside the home because he had just given

---

[1] We adopt the naming conventions of the parties.

Gill's daughter a ride home in his taxi van. As Harjit began to leave the driveway, Grewal parked his Mustang behind the van, potentially blocking its exit. Gill got out and shot Harjit five times. Harjit died.

The State charged Gill with one count of first degree murder. The first trial ended in a mistrial due to a hung jury.

At the second trial, there was a dispute over what occurred just before Gill shot Harjit. Gill claimed self-defense. Several other witnesses, including Gill's daughter and son, testified differently about the incident.

The jury found Gill guilty of first degree murder and also found that he had committed the crime with a firearm. The trial court entered its judgment and sentence on the jury's verdict.

Gill appeals.

## ATTORNEY TESTIMONY

Gill argues that the trial court abused its discretion by admitting testimony from his ex-wife's dissolution attorney under ER 404(b) and ER 403. We hold that the court did not abuse its discretion in either respect.

Evidence must be relevant to a material issue before a jury.[2] Under ER 404(b), trial courts may not admit evidence of a defendant's prior wrongdoings to show that he acted in conformity with those other acts. But the rule provides exceptions and allows the admission of relevant evidence to show motive.[3]

---

[2] State v. Olsen, 175 Wn. App. 269, 280, 309 P.3d 518 (2013), aff'd, 180 Wn.2d 468, 325 P.3d 187 (2014); ER 401.

[3] ER 404(b).

Motive prompts a person to act.[4] It "goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act."[5] Evidence of a defendant's motive is relevant in a homicide prosecution.[6]

Evidence of past disputes and ill-feeling between the defendant and victim is admissible to show motive.[7] Such evidence "often bears directly upon the state of mind of the accused with consequent bearing upon the question of . . . premeditation."[8]

A trial court may exclude relevant evidence if the danger of unfair prejudice substantially outweighs its probative value.[9]

We review for abuse of discretion a trial court's decision to admit evidence.[10]

Here, the State argued that Gill had a motive to kill Harjit because Gill believed that Harjit and Daljit Kaur, Gill's ex-wife, had an affair. The State further argued that Gill blamed Harjit for the destruction of Gill's marriage and strained relationship with his children that followed the end of the marriage.

---

[4] State v. Powell, 126 Wn.2d 244, 259-61, 893 P.2d 615 (1995).

[5] Id. at 259.

[6] State v. Stenson, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997).

[7] Id.

[8] Id.

[9] Id.; ER 403.

[10] State v. Quaale, 182 Wn.2d 191, 196, 340 P.3d 213 (2014).

Pretrial, the State moved in limine to admit testimony from Daljit's dissolution attorney about the "contentious[]" dissolution proceedings and disputes between Gill and Daljit from 2004 through 2012. Gill and Daljit finalized their dissolution in 2008. Gill sought to exclude the evidence, claiming it was irrelevant and highly prejudicial.

The trial court admitted the evidence to establish Gill's motive. The court explained:

> From the Defendant's point of view, that time period was one of sadness and threats and actions by [Harjit], leading to depression and PTSD, and ultimately self-defense. From the State's point of view, that time period was one of acrimony and difficulties caused by an alleged affair that involved Mr. Gill's wife, as well as [Harjit], building anger and resentment, and ultimately ending up in murder. It's supported, I think, for those purposes, by the Defendant's statement in [a] declaration that it was the affair that broke up the marriage . . . . I think that goes to his state of mind involving both his wife and [Harjit].[11]

The trial court also found that the evidence was not unduly prejudicial to Gill. The court explained that it did not "see anything . . . that would truly be propensity evidence." The court further found that the jury would hear the evidence because it related to the State's expert's opinion regarding Gill's depression. Thus, the trial court found a "lack of [undue] prejudice."

We conclude that the trial court did not abuse its discretion by admitting the attorney's testimony. The State offered the testimony to show a bitter dissolution proceeding and continuous disputes that stemmed from Daljit's

---

[11] Report of Proceedings (September 29, 2014) at 3.

alleged affair with Harjit. This testimony was relevant to Gill's motive to shoot Harjit. It was also relevant to rebut Gill's claim of self-defense.

As for the ER 403 issue, the trial court properly weighed the prejudice of the evidence against its probative value. It determined that the danger of unfair prejudice did not substantially outweigh its probative value. The record supports this decision.

Gill argues that the evidence was inadmissible because it "portray[ed] [him] as a 'bad' person." His argument focuses on contempt orders entered against him during the dissolution proceedings. Although evidence of the contempt orders may have been prejudicial, it was not unduly prejudicial, as the rule requires. The purpose of the evidence surrounding Gill and Daljit's dissolution, which included their disputes before and after the dissolution, was to show motive and rebut the claim of self-defense. That some of the testimony may not have been directly relevant to the underlying purpose of admission does not change the propriety of the court's decision.

Similarly, Gill argues that the dissolution evidence was irrelevant because it did not relate to the alleged affair. But according to the State's theory of the case, Daljit's alleged affair with Harjit caused the dissolution, which ultimately provided motive for the shooting. Gill also submitted a declaration during the dissolution proceedings, explaining that Daljit's affair led to "the break[down] of [the] marriage." Thus, the dissolution evidence was relevant.

Gill also argues that the State had "no justification" for calling the attorney as a witness because the dissolution was finalized in 2008, four years prior to the

shooting. By making this argument, Gill appears to argue that the dissolution evidence was no longer relevant because of the passage of time. But the length of time between the dissolution and the shooting goes to the weight of the evidence, not its admissibility.[12]

The trial court also rejected this argument below. Due to a confrontation between Gill and Harjit in 2010, the court found "serious issues in [Harjit's] role in this [dissolution] process." The record supports the trial court's decision.

Lastly, Gill argues that admission of the attorney's testimony was improper because it concerned documents and events in which the attorney did not participate. Because Gill makes this argument for the first time on appeal, we need not consider it further.[13]

Accordingly, we conclude that the trial court did not abuse its discretion by admitting this testimony.

## INTERPRETER

Gill argues that a trial interpreter failed to accurately interpret testimony of a key witness and that such allegedly inaccurate interpreting violated his constitutional rights.[14] The record does not support this argument.

---

[12] See State v. Lord, 117 Wn.2d 829, 872, 822 P.2d 177 (1991).

[13] RAP 2.5(a).

[14] Appellant's Opening Brief at 22-35.

The Sixth and Fourteenth Amendments guarantee criminal defendants the right to a fair trial.[15] Washington's Constitution provides a similar safeguard.[16] Due process requires that a defendant have a meaningful opportunity to present a complete defense.[17] This includes the right to offer witness testimony.[18]

A defendant's right to an interpreter is based on the Sixth Amendment right to confront witnesses and "'the right inherent in a fair trial to be present at one's own trial.'"[19]

The appropriate use of interpreters is a matter within the trial court's discretion.[20]

*Interpreter Competency*

Gill argues that the interpreter failed to competently interpret Grewal's testimony. We hold that he fails to show that any such shortcomings materially affected his rights.

"[A] defendant's right to an interpreter means a right to a competent interpreter."[21] When a defendant challenges an interpreter's competency, "the

---

[15] State v. Larson, 160 Wn. App. 577, 590, 249 P.3d 669 (2011).

[16] Id.; Const. art. I, §§ 3, 22.

[17] Larson, 160 Wn. App. at 590.

[18] Id.

[19] State v. Ramirez-Dominguez, 140 Wn. App. 233, 243, 165 P.3d 391 (2007) (quoting State v. Gonzales-Morales, 138 Wn.2d 374, 379, 979 P.2d 826 (1999)).

[20] Id. at 244.

[21] State v. Teshome, 122 Wn. App. 705, 711, 94 P.3d 1004 (2004).

standard for competence should relate to whether the rights of non-English speakers are protected, rather than whether the interpreting is . . . egregiously poor."[22]

RCW 2.43.080 requires that all language interpreters serving in a legal proceeding abide by a code of ethics. An interpreter takes an oath that he or she "will repeat the statements of the person being examined to the court . . . to the best of the interpreter's skill and judgment."[23]

GR 11.2 also applies and provides that an interpreter:

shall interpret or translate the material thoroughly and precisely, *adding or omitting nothing*, and stating as nearly as possible what has been stated in the language of the speaker . . . .[24]

The rule also provides, in relevant part:

When a language interpreter has any reservation about [his or her] ability to satisfy an assignment competently, the interpreter shall immediately convey that reservation to the parties and to the court.[25]

Here, Gill argues that the interpreter violated GR 11.2 and chapter 2.43 RCW. But he fails to show that this materially affected his rights.

Grewal testified for four days, but Gill's argument focuses on the second and third days of Grewal's testimony. An interpreter interpreted for Grewal on

---

[22] Id. at 712.

[23] Former RCW 2.43.050 (1989).

[24] GR 11.2(b) (emphasis added).

[25] GR 11.2(c).

the first day when he explained the details surrounding the shooting. Gill did not object at trial to any of these interpretations.

On the second day, Grewal testified through a different interpreter. The record shows some confusion between Grewal and the interpreter near the beginning of the testimony. The State asked Grewal about a different name that he had used. The following exchanges occurred:

> [State]: At one point, you told us that you went by the name Henry.
>
> [Grewal through interpreter]: Yes.
>
> [State]: But you said that you've stopped using that name.
>
> [Grewal through interpreter]: It's not a big deal. By 9:00.
>
> [Grewal]: What?
>
> (Discussion in Punjabi.)
>
> [Grewal through interpreter]: Harjinder.
>
> (Further discussion in Punjabi.)
>
> [Grewal through interpreter]: It's just not a big thing in name. My name is Harjinder, but some people call me Henry. So it's nothing much in the name.[26]

Later, the State asked Grewal whether Gill or his brother-in-law, Swarn Gill, owned a limousine company.[27] Grewal corrected the interpreter's interpretation of his answer. The following exchange occurred:

> [Grewal through interpreter]: Jaspal Gill used to take care of the company.

---

[26] Report of Proceedings (October 8, 2014) at 1137.

[27] Id. at 1139.

9

[State]: He used to take care of the company? Or was it his company?

[Grewal through interpreter]: What I knew was that Swarn Gill was -- used to take care of the company.

[Grewal]: No. He's the owner.

[Grewal through interpreter]: He's the owner and take care of the company.[28]

Grewal then stopped to explain a possible misunderstanding with the interpreter.[29] The following exchange occurred:

[Grewal]: By the way, I have a question. It looks like I'm translating literally wrong way. Every time I'm having kind of issue. I say something else, every time something else. You know? I don't want to speak very good English, but I try to understand most of it. It looks like it's interpreting a little bit different way. I'm sorry. I'm misunderstanding you or you're understanding me.

[Interpreter]: I'm a trained interpreter, and the language is my native language.
. . . .
But if you speak slowly, and don't say it again, you know, just once.
. . . .

[Grewal]: Okay.

[State]: Mr. Grewal, let me ask you to do this for now. Please break up what you're saying into small bits so that Madam Interpreter can properly interpret, just like how I'm breaking up my questions.[30]

Thereafter, the interpreter expressed difficulty understanding Grewal. During Grewal's answer to a question, the interpreter and Grewal had a

---

[28] Id.

[29] Id. at 1140.

[30] Id.

discussion in Punjabi. The interpreter stated to the court: "It doesn't make sense."[31] Grewal then repeated his answer and testified the rest of the day without incident.

On the third day, Grewal corrected the interpreter's interpretation again. In response to the State's question regarding a photograph of items on Grewal's coffee table, the following exchange occurred:

> [Grewal through interpreter]: There's a remote, there is a telephone, and there is –
>
> [Grewal]: A remote. I did not say telephone; I said remote.
>
> [Grewal through interpreter]: So there are two remotes . . . .[32]

Later, outside the jury's presence and after Grewal's lengthy testimony about the shooting, Gill raised a concern about the accuracy of the interpretation. He claimed, for example, that the interpreter did not interpret Grewal's "yes" response to a question and only interpreted his explanation following the "yes" response. Gill requested that the trial court replace the then interpreter with the interpreter from the first day.

The State objected but told the court that several people in the audience informed the State of some inaccurate interpretations. The interpreter took the stand for examination.

The interpreter explained her professional experience and that she accurately and truthfully interpreted questions from English to Punjabi. But she

---

[31] Id. at 1180.

[32] Report of Proceedings (October 9, 2014) at 1294.

explained that Grewal "babbles . . . extra words" and "add[ed] extra incoherent words" to a sentence. She further explained that she paraphrased his testimony rather than interpret each word, giving "the important thing, . . . the gist . . . ."

The State suggested that the trial court instruct Grewal to wait until a complete interpretation is given before answering a question. The State also suggested that Grewal provide "short segments [of testimony] at a time." Gill agreed with these recommendations and suggested that Grewal testify slowly. Gill did not request that Grewal restate his earlier testimony.

Before Grewal resumed his testimony, the trial court instructed the interpreter to interpret "each and every word." It also instructed the interpreter to do so "whether or not it ma[de] sense . . . to [her], or whether [she] believe[d] [it] [wa]s an incomplete answer or sentence . . . ." For the remainder of the third day and throughout the fourth day, Grewal testified, in detail, about the shooting without incident.

There is no dispute that the interpreter violated GR 11.2(b) by failing to "interpret or translate the material thoroughly and precisely, *adding or omitting nothing* . . . ."[33] Thus, she failed to abide by the oath that she would "repeat the statements of the person being examined."[34]

It is also arguable that the interpreter violated GR 11.2(c) because she failed to immediately convey to the parties and the court her "reservation about

---

[33] (Emphasis added.)

[34] Former RCW 2.43.050.

[her] ability" to competently interpret Grewal's testimony. The interpreter did not state any problems with Grewal's answers until her examination on the third day of Grewal's testimony.

Nevertheless, we conclude that the interpreter's conduct did not deprive Gill of his rights.

Gill relied on Grewal's testimony to support his theory of the case. But the specific interpretation discrepancies, described above, were not material to Grewal's testimony about the shooting. Specifically, Grewal's testimony about his nickname, the owner of a limousine company, and items on his coffee table were immaterial to Gill's self-defense claim.

Additionally, Grewal testified about the shooting, in detail, after the trial court instructed the interpreter to interpret every word of the testimony. That testimony was consistent with and further developed the unchallenged testimony from the first day. Gill has not challenged the correctness of this interpretation.

Gill relies on Grewal's "two remotes" testimony to argue that the interpreter "interjected her personal views of the evidence." This is not so.

GR 11.2(b) states that an interpreter "shall use the level of communication that best conveys the meaning of the source, and shall not interject [his or her] personal **moods or attitudes**."[35] As discussed above, Grewal corrected the interpreter's interpretation of his testimony regarding a photograph of items on his coffee table. During the interpreter's examination, she explained that she

---

[35] (Emphasis added.)

incorrectly said "phone" instead of "two remotes." She thought the photograph of the items contained a remote and a phone, rather than two remotes.

Gill's argument is unpersuasive for two reasons. First, Gill's argument inaccurately cites the rule. The rule refers to the interpreter's moods and attitudes when "convey[ing] the meaning of the source" of communication.[36] It does not mention an interpreter's personal view of the evidence. Second, Gill fails to show how the interpreter's incorrect interpretation about items in a photograph interjected her "personal *moods or attitudes*."[37]

Gill fails in his burden to establish that any interpreter shortcomings materially affected his rights. Accordingly, we need not examine his arguments regarding structural or harmless error.

## PROSECUTORIAL MISCONDUCT

Gill argues that the prosecutor committed misconduct, depriving him of his right to a fair trial. We hold that no such misconduct occurred.

To prevail on a prosecutorial misconduct claim, a defendant must establish that the prosecutor's conduct was improper and prejudicial.[38] The absence of either misconduct or prejudice is fatal to this claim.[39]

---

[36] GR 11.2(b).

[37] Id. (emphasis added).

[38] State v. Lindsay, 180 Wn.2d 423, 431, 326 P.3d 125 (2014).

[39] See Stenson, 132 Wn.2d at 718-19.

14

Prosecutors may not express personal opinions on the credibility of a witness.[40] But no prejudicial error occurs "unless it is 'clear and unmistakable'" that the prosecutor expressed a personal opinion.[41] For example, a prosecutor improperly asserts his or her opinion on a witness's credibility by calling a witness a liar.[42]

Here, Gill objected during the State's direct examination of Grewal, claiming that the prosecutor had been leading the witness. In response, the prosecutor requested permission to treat Grewal as a "hostile witness based on the way he answer[ed] [the] questions."[43] Gill responded that the prosecutor should not have made such a statement, and the trial court called for a recess.

Out of the jury's presence, the court considered the further arguments of the parties. It then gave instructions on how further examination of the witness should be handled. The court did not otherwise rule on the objection.

Notably, there is nothing in this record to suggest that the basis of Gill's objection below was the prosecutor's alleged expression of an opinion on Grewal's credibility. In any event, Gill did not request a curative instruction and

---

[40] Lindsay, 180 Wn.2d at 437.

[41] State v. Calvin, 176 Wn. App. 1, 19, 316 P.3d 496 (2013) (internal quotation marks omitted) (quoting State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (plurality opinion)).

[42] See Lindsay, 180 Wn.2d at 438; State v. Reed, 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

[43] Report of Proceedings (October 8, 2014) at 1149-50.

none was given. Thereafter, the jury returned to the courtroom and the examination continued.

Gill argues that the prosecutor's characterization of Grewal as a hostile witness expressed the prosecutor's opinion on Grewal's credibility. He specifically argues that the prosecutor conveyed his opinion that Grewal was not honest or forthcoming. This argument is unpersuasive.

When viewed in the context of the prosecutor's examination of this witness, which appears to have been based on this witness's prior testimony, there simply is no reasonable basis to conclude that the prosecutor expressed his opinion on Grewal's credibility. Rather, the prosecutor appropriately responded to Gill's objection by explaining his request to ask leading questions. We need not decide whether this response was legally correct. There is no doubt that Gill's claim of misconduct fails because he cannot "'clear[ly] and unmistakab[ly]'" show that the prosecutor expressed his personal opinion on Grewal's credibility.[44]

Because Gill fails to establish misconduct, we need not address the prejudice prong of his claim.

## SUFFICIENCY OF EVIDENCE

Gill argues that insufficient evidence supports the jury's finding of premeditated murder. We disagree.

---

[44] Calvin, 176 Wn. App. at 19 (internal quotation marks omitted) (quoting Brett, 126 Wn.2d at 175).

Due process requires the State to prove beyond a reasonable doubt every element of a crime.[45] An insufficient evidence claim "admits the truth of the State's evidence and all reasonable inferences from that evidence."[46] The critical inquiry is "'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"[47] We "view the 'evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.'"[48]

"Circumstantial evidence and direct evidence can be equally reliable."[49] But "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation."[50] Inferences are logical conclusions or deductions from an established fact.[51]

---

[45] State v. Rodriquez, 187 Wn. App. 922, 930, 352 P.3d 200, review denied, 184 Wn.2d 1011 (2015).

[46] Id.

[47] Id. (quoting Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

[48] State v. Garcia, 179 Wn.2d 828, 836, 318 P.3d 266 (2014) (quoting State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009)).

[49] Rodriquez, 187 Wn. App. at 930.

[50] State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

[51] Tokarz v. Ford Motor Co., 8 Wn. App. 645, 654, 508 P.2d 1370 (1973).

Premeditation "must involve more than a moment in . . . time."[52] A defendant's "'mere opportunity to deliberate is not sufficient to support a finding of premeditation.'"[53]

"The State can prove premeditation by circumstantial evidence 'where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial.'"[54] Four factors—the defendant's motive, procurement of a weapon, stealth, and the method of killing—are "'particularly relevant to establish premeditation.'"[55] For example, a defendant's prior threats, multiple gunshots, and plan to bring a weapon to the scene provide circumstances to support a jury's finding of premeditation.[56] But the presence of all four of the above factors is not required to establish premeditation.[57]

Here, the jury found Gill guilty of first degree murder. To do so, it had to find beyond a reasonable doubt that Gill acted with premeditated intent to cause Harjit's death. The trial court provided the following "premeditated" instruction:

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled

---

[52] RCW 9A.32.020(1).

[53] State v. Hummel, 196 Wn. App. 329, 354, 383 P.3d 592 (2016) (quoting State v. Pirtle, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)), review dismissed, 187 Wn.2d 1021 (2017).

[54] Id. at 355 (quoting Pirtle, 127 Wn.2d at 643).

[55] Id. (quoting Pirtle, 127 Wn.2d at 644).

[56] See State v. Ra, 144 Wn. App. 688, 703, 175 P.3d 609 (2008).

[57] See State v. Sherrill, 145 Wn. App. 473, 485-86, 186 P.3d 1157 (2008).

18

purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.[58]

As to the first premeditation factor, the evidence established Gill's motive to kill Harjit. The evidence shows that Gill continued to have confrontations with, and continued to harbor anger towards, Harjit.

Gill testified that he continued to have confrontations with Harjit before the shooting. Gill's son, Jagrit Gill, testified that Gill was angry with Harjit and suspected an affair between Daljit and Harjit. Jagrit also testified that Harjit often visited the family's home to provide assistance, against Gill's wishes.

Gill's daughter, Manrit Kaur, similarly testified that Gill was angry with Harjit and did not want him around Daljit or the family's home. She and Daljit testified to hearing Gill express his desire to buy a gun and kill Harjit.

As to the second premeditation factor, Gill bought a gun after a confrontation with Harjit in 2010. He later acquired another gun, which he used in the shooting, and carried it with him most of the time.

As to the third factor of stealth, "evidence that the defendant attempted to hide himself from the victim prior to the attack" supports the inference of premeditation.[59]

Here, Manrit testified that she believed she saw the Mustang parked across the street when Harjit pulled into the driveway. Manrit and Jagrit saw the

---

[58] Clerk's Papers at 326.

[59] State v. Barajas, 143 Wn. App. 24, 36-37, 177 P.3d 106 (2007).

Mustang pull into the driveway and stop behind, and/or very close to, Harjit's van, potentially blocking its exit. Manrit and Jagrit then saw Gill get out of the car and move to the driver's side of the van.

The evidence conflicted on whether Harjit remained in, or attempted to exit, the van. The jury also watched video footage from Harjit's van, which showed the Mustang's arrival.

Although this evidence may not establish that Gill attempted to hide from Harjit before shooting him, the jury could reasonably infer that Gill approached Harjit in this manner to catch him off guard.

The final premeditation factor, the method of murder, is significant.[60] A "lengthy and excessive attack provides evidence of premeditation."[61] Additionally, a pause between gunshots supports an inference that a defendant "had time to deliberate on and weigh his decision" to kill the victim.[62]

Here, the evidence showed that Gill fired five shots to kill Harjit, striking Harjit's shoulder, arm, and chest. Neighbors testified that they heard one or more gunshots, followed by a short pause and more gunshots. After the shooting, Gill reentered the Mustang and Grewal drove away.

Manrit saw the shooting from an undetermined distance. She testified that Gill was approximately one and a half feet away from Harjit during the shooting.

---

[60] Sherrill, 145 Wn. App. at 485.

[61] State v. Cortes Aguilar, 176 Wn. App. 264, 274, 308 P.3d 778 (2013).

[62] Ra, 144 Wn. App. at 704.

She did not hear Harjit say anything but she heard Gill swear at Harjit, in an angry tone, before shooting him. Although she did not see the shooting, she heard several gunshots and saw Gill holding a gun with his arm extended out.

Jagrit testified that he was home watching television when he saw, through a nearby window, Gill open the van door before he began shooting. Jagrit did not see the gunfire, but he saw Gill holding the gun with his arm extended out. Jagrit did not hear any conversation between Gill and Harjit before the gunshots.

Taken together, the evidence showed that Gill "had time to deliberate on and weigh his decision" to kill Harjit.[63] It showed that Gill had Grewal drive him to the family home and park across the street. Gill had a loaded gun and instructed Grewal to pull into the driveway, behind and/or very close to Harjit's van. Gill exited the Mustang and approached the van's driver side door. Gill may have sworn at Harjit before firing the gun, pausing, and firing again.

Gill's and Grewal's testimonies provided the jury with alternative versions of the events. Both testified that Harjit threatened Gill and may have attempted to hit him with the van. But this court defers to the jury on questions regarding conflicting evidence, witness credibility, and the persuasiveness of evidence.[64] Considering the evidence in a light most favorable to the State, substantial evidence supports the jury's finding regarding Gill's premeditated intent. Thus,

---

[63] Id.

[64] Rodriquez, 187 Wn. App. at 930.

we hold that a reasonable juror could find beyond a reasonable doubt that Gill killed Harjit with premeditated intent.

Gill argues that the State relied on speculation to establish premeditation. But as previously stated, inferences are logical conclusions or deductions from an established fact.[65] Speculation is "[t]he act or practice of theorizing about matters over which there is no certain knowledge."[66] Here, the State presented substantial circumstantial evidence that allowed the jury to reasonably infer that Gill killed Harjit with premeditated intent. Thus, this argument is unpersuasive.

## JURY INSTRUCTION

For the first time on appeal, Gill argues that the voluntary intoxication instruction was improper. He does so for three reasons. First, he argues that the trial court improperly imposed an affirmative defense instruction over his objection. Second, he argues that the instruction commented on the evidence. Lastly, Gill argues that the instruction was legally erroneous. Because Gill fails to satisfy the requirements of RAP 2.5(a), we do not address his substantive arguments.

Under RAP 2.5(a), we may refuse to review any claim of error that was not raised in the trial court. But a party may raise certain issues for the first time on appeal, including a manifest error affecting a constitutional right.[67] We may allow

---

[65] Tokarz, 8 Wn. App. at 654.

[66] BLACK'S LAW DICTIONARY 1617 (10th ed. 2014).

[67] RAP 2.5(a)(3); see also State v. Lamar, 180 Wn.2d 576, 582, 327 P.3d 46 (2014).

this limited exception to a failure to preserve error based on the answers to two questions: "(1) Has the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?"[68] If Gill establishes a manifest constitutional error, this court conducts the harmless error analysis to determine if the error requires reversal.[69]

Here, the State proposed a voluntary intoxication instruction. Gill objected. After the parties and the court discussed the instruction at length, the trial court drafted a substitute instruction that it ultimately gave to the jury as Instruction 27. Gill chose not to object to this instruction when the court asked for exceptions.

We assume for purposes of analysis that each of the three challenges is of constitutional magnitude. The State does not argue otherwise. Thus, the question is whether any challenge is "manifest."[70]

As for manifest error, Gill must show actual prejudice.[71] This requirement focuses on "whether the error is so obvious on the record" that it warrants appellate review.[72] Thus, the complaining party must make "a 'plausible showing . . . that the asserted error had practical and identifiable consequences in the

---

[68] State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

[69] State v. Coristine, 177 Wn.2d 370, 379-80, 300 P.3d 400 (2013).

[70] RAP 2.5(a).

[71] Kalebaugh, 183 Wn.2d at 584.

[72] State v. O'Hara, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009).

trial."[73] To determine whether an error is practical and identifiable, this court "'must place itself in the shoes of the trial court'" to ascertain whether the trial court could have corrected the error given what it knew at that time.[74]

The following facts are necessary to provide context about the relationship between Gill's self-defense claim and the voluntary intoxication instruction.

### Imposition of Affirmative Defense

Gill first argues that the second sentence of the instruction imposed an affirmative defense of voluntary intoxication over his objection. This claimed error is not manifest.

Here, the court instructed the jury to acquit Gill if it found that he acted in self-defense. To do so, the jury had to find that Gill reasonably believed that Harjit intended to inflict death or great personal injury upon him. The jury also had to find that Gill reasonably believed there was imminent danger of harm.

As to Gill's reasonable beliefs, the parties presented evidence regarding his alleged PTSD. This condition may have been caused by a frightening encounter with Harjit in 2010. Gill's expert witness testified about PTSD symptoms, including increased startle responses and a possible increase of a "fight or flight" reaction. But the expert witness could not conclude with certainty whether Gill suffered from PTSD at the time of the shooting, or whether it contributed to the shooting. The State's expert witness diagnosed Gill with

---

[73] Kalebaugh, 183 Wn.2d at 584 (quoting O'Hara, 167 Wn.2d at 99).

[74] Id. (quoting O'Hara, 167 Wn.2d at 100).

depression and could not conclude with certainty whether Gill had PTSD at the time of the shooting, or whether it contributed to the shooting.

Additionally, Gill consumed alcohol before the shooting. The parties' experts testified about alcohol's effect in general and its possible effects on someone experiencing PTSD.

As stated above, the trial court provided the following limiting instruction in Instruction 27:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. ***However, evidence of intoxication may be considered as it relates to your consideration of post-traumatic stress disorder.***[75]

Gill's challenge focuses on the emphasized portion of the instruction. He argues that he "never claimed that his culpability was reduced because he had consumed alcohol before the shooting." By making this argument, he appears to argue that the trial court imposed an affirmative defense of voluntary intoxication over his objection. The trial court did not do so.

A defendant's claim of voluntary intoxication does not excuse the criminality of an act.[76] But voluntary intoxication "'can render the defendant incapable of forming the specific intent necessary for conviction of the crime.'"[77] Thus, evidence of a defendant's voluntary intoxication is relevant to the jury's

---

[75] Clerk's Papers at 344 (emphasis added).

[76] State v. Stacy, 181 Wn. App. 553, 569, 326 P.3d 136 (2014).

[77] Id. (quoting State v. Mriglot, 88 Wn.2d 573, 576 n.2, 564 P.2d 784 (1977)).

determination of whether the defendant acted with a particular degree of mental culpability.[78]

Gill did not assert a voluntary intoxication defense at trial. Thus, the trial court did not instruct the jury to determine whether Gill's intoxication rendered him incapable of forming the specific intent necessary for murder. Rather, the jury had to determine whether Gill reasonably believed that Harjit intended to inflict death or great personal injury upon him.

This instruction did not create practical and identifiable consequences at trial. The trial court recognized the different jury determinations relevant to a voluntary intoxication defense and a self-defense claim. It properly gave this instruction to limit how the jury used certain evidence before it. This does not obviously create a situation where the court imposed an affirmative defense of voluntary intoxication over Gill's objection. Accordingly, the trial court's instruction does not constitute a manifest error.

To support his argument, Gill argues that the State proposed an instruction "that relates solely to a statutory defense." But the initial instruction that the State proposed is irrelevant because the trial court drafted the instruction that it gave the jury. That instruction is the focus here, not the State's proposed instruction.

---

[78] Id.

26

### *Comment on the Evidence*

Gill next argues that the second sentence of the instruction commented on the evidence. This claimed error is not manifest.

We must review the facts and circumstances of each case to determine whether an act constitutes a comment on the evidence.[79] Our fundamental question in analyzing judicial comments "is whether the mere mention of a fact in an instruction conveys the idea that the fact has been accepted by the court as true."[80] An instruction improperly comments on the evidence when it relieves the State of its burden of proof or "resolve[s] a contested factual issue for the jury."[81] An instruction does not comment on the evidence if the trial court "appropriately instruct[s] the jury on the use of evidence" admitted for limited purposes.[82]

Here, the second sentence of the jury instruction did not comment on the evidence. Rather, it properly instructs the jury on the use of intoxication evidence. A plain reading of the instruction shows this, and states:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. ***However, evidence of intoxication may be considered as it relates to your consideration of post-traumatic stress disorder.***[83]

---

[79] State v. Francisco, 148 Wn. App. 168, 179, 199 P.3d 478 (2009).

[80] State v. Levy, 156 Wn.2d 709, 726, 132 P.3d 1076 (2006).

[81] State v. Brush, 183 Wn.2d 550, 557, 559, 353 P.3d 213 (2015).

[82] Wuth ex rel. Kessler v. Lab. Corp. of Am., 189 Wn. App. 660, 700, 359 P.3d 841 (2015).

[83] Clerk's Papers at 344 (emphasis added).

Moreover, nothing about the instruction communicated the judge's view on any contested factual issue. Although the instruction mentions PTSD and intoxication, it does not "convey[] the idea that the fact has been accepted by the court as true."[84] Whether Gill had PTSD and whether his intoxication affected his alleged condition remained contested factual issues for the jury. Thus, the trial court's instruction does not constitute a manifest error.

Gill argues that the instruction resolved a disputed issue of fact for the jury—specifically, the relationship between intoxication and PTSD. He also argues that the instruction "emphasized the State's case" to his detriment and "told the jury [that] it should credit the State expert's opinion." The plain terms of the instruction show that it did not do so.

### Erroneous Instruction

Gill argues that the trial court provided a legally erroneous instruction. We again disagree.

"Jury instructions are proper when, read as a whole, they permit parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law."[85] We consider the challenged portion of the instruction in context.[86]

---

[84] Levy, 156 Wn.2d at 726.

[85] Spivey v. City of Bellevue, 187 Wn.2d 716, 738, 389 P.3d 504 (2017).

[86] State v. Fehr, 185 Wn. App. 505, 514, 341 P.3d 363 (2015).

Here, Gill challenges the first sentence of Instruction 27, discussed above, which provides:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.[87]

He argues that this instruction misstated the law because it "contradict[ed] the legal requirement that the jury put itself in [Gill's] shoes" when determining whether he acted in self-defense. He also argues that the instruction relieved the State of its burden to disprove his self-defense claim. He specifically argues that the instruction "told the jury that any act committed by [Gill] after consuming alcohol was criminal." Not so.

Gill is correct that the jury must stand in the defendant's shoes and consider all the facts and circumstances known to the defendant to determine whether he acted in self-defense.[88] But the sentence at issue is entirely separate from a self-defense instruction because it relates to a voluntary intoxication defense.[89] More importantly, the plain language of this sentence shows that it does not contradict the subjective component of the self-defense instruction.

Additionally, nothing in the sentence instructed the jury to find that Gill committed a crime if it found that he was intoxicated. Thus, the trial court's instruction does not constitute a manifest error.

---

[87] Clerk's Papers at 344.

[88] See State v. Woods, 138 Wn. App. 191, 198, 156 P.3d 309 (2007).

[89] Compare RCW 9A.16.090, with RCW 9A.16.050(1).

Gill also argues that this sentence instructs the jury to "ignore the facts that might have influenced Gill's perspective." Again, nothing in this sentence tells the jury to do so. Rather, the sentence correctly explained to the jury that intoxication does not excuse criminal acts.[90]

Lastly, Gill argues that this instruction "tipped the scales" in the State's favor. To support this argument, Gill relies on an allegation that the trial court did not give this instruction in his first trial, which resulted in a hung jury.

Gill's argument is unpersuasive because it is purely speculative. We simply cannot know from this record why there was a hung jury in the first trial.

Because there is no manifest error for any of the three arguments, we need not determine whether there was harmless error.

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

_Spearman, J._      _Dwyer, J._

---

[90] See RCW 9A.16.090.